# DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES v. KING

## Case No. 86-3027

State of Florida, Division of Administrative Hearings

December 1, 1987

### APPEARANCES OF COUNSEL

**Leslie Mendelson,** Department of Health and Rehabilitative Services, for petitioner.

**Alice K. Nelson** for respondent

### OPINION OF THE COURT

DIANE D. TREMOR, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, an administrative hearing was held before Diane D. Tremor, Hearing Officer with the Division of Administrative Hearings, on June 15 and 16, 1987, in Tampa, Florida. The issue for determination in this proceeding is whether the lay midwifery license of Skippy King should be revoked or otherwise disciplined for the reasons set forth in the Administrative Complaint filed on August 4, 1986.

## INTRODUCTION

By an Administrative Complaint filed on August 4, 1986, the petitioner seeks to revoke the lay midwifery license of Skippy King for alleged violations of Chapter 467, *Florida Statutes,* and Chapter 10D-36, *Florida Administrative Code.* More specifically, it is alleged that respondent violated Rule 10D-36.046(4) and (9) by delivering an infant weighing 11 pounds 2 ounces and failing to report the utilization of emergency measures; that she violated Rule 10D-36.042(4) by failing to have the third trimester physician exam signed and by failing to have a record of fetal heart tones, size of baby or presentation of fetus; that she violated Rule 10D-36.045 by delivering an infant despite the absence of a satisfactory test for gonorrhea; and that she violated Section 467.203 when she failed to contact an emergency medical transport team to deliver an infant and mother to the emergency room after complications arose.

In support of the charges against the respondent, the petitioner presented the testimony of Jody Blalock; Charles Mahan, M.D., accepted as an expert in the field of obstetrics and gynecology; and Ann Richter, accepted as an expert in the field of midwifery. HRS's Exhibits 4, 5, and 6 were received into evidence.

The respondent testified in her own behalf and also presented the testimony of Quentin DeHaan, M.D., accepted as an expert in the fields of obstetrics and gynecology. Joint Exhibits 1, 2, and 4 through 16 were received into evidence. The parties' Prehearing Stipulation has been designated as Hearing Officer's Exhibit 1.

Subsequent to the hearing, both parties submitted proposed recommended orders. To the extent that the parties' proposed findings of fact are not included in this Recommended Order, they are rejected for the reasons set forth in the Appendix hereto.

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced at the hearing, as well as the parties' stipulations of fact, the following relevant facts are found:

(1) Respondent Skippy King is a licensed practical nurse, having obtained that license in 1973. She first applied for her Florida license as a lay midwife in 1977 and, after litigation with HRS, obtained that license in 1982. She is a member of various midwife and home birthing associations, is a certified childbirth educator and has delivered approximately 500 babies.

(2) In August of 1985, respondent accepted V.W. as a patient for the

birth of her fourth child. During the initial visit, respondent assessed a risk factor of one for V.W. since she had previously given birth to a child weighing in excess of 4,000 grams. V.W.'s other two children weighed 8 pounds, 12 ounces, or approximately 4,000 grams, at birth.

(3) In mid-March, 1986, respondent delivered to patient V.W. an 11 pound, 2 ounce baby boy. Respondent experienced difficulty in delivering the baby's shoulders and performed a Woods Maneuver to accomplish the delivery. Shoulder dystocia is a common complication associated with large babies. The Woods Maneuver is a procedure whereby the anterior shoulder is pushed to the posterior position. The evidence was not sufficient to support a finding that the Woods Maneuver constitutes a "forcible" means of assisting birth.

(4) The delivery of large babies in a home situation is unsafe for the baby and the mother due to the difficulty of labor, potential lacerations to the mother and potential postpartum hemorrhaging by the mother. Here, fortunately, no harm occurred to either V.W. or her baby.

(5) While it is difficult to determine fetal weight with precision prior to delivery, respondent had enough cludes to have suspected a weight in excess of 4,000 grams. These included the weight of the mother and her history of giving birth to large babies. While V.W. only gained approximately 30 pounds between her initial visit to respondent and her delivery date, she weighed 190 pounds at the time of delivery. There are methods utilized by physicians for estimating fetal weights. Some two weeks prior to V.W.'s delivery, it could be estimated that the baby's weight would be in excess of 4,000 grams. Respondent herself was not surprised by V.W.'s baby weighed over nine pounds, thought she was "shocked" at the 11 pound, 2 ounce birth weight.

(6) Attached to respondent's clinical file for patient V.W. was a one-page, unsigned report of a medical check-up occurring in early February of 1986. This report is illegible in parts and does not appear to contain any risk assessment for midwifery delivery at home. There was no notation of fetal heart tones or size of the baby. Respondent testified that this paper was the third trimester exam and risk assessment performed by a physician, Dr. Dorado. She further states that she has worked with Dr. Dorado for several years, involving some twenty patients, that she recognizes his handwriting and that, when risk factors are a concern, he communicates such concerns to her by telephone.

(7) Respondent accepted C.S. as a patient. The culture for gonorrhea testing obtained by respondent was out of date, and respondent was informed by HRS that the test needed to be repeated. In spite of this

231

advice, respondent did not retest C.S. for gonorrhea until she returned for her six week check-up after the delivery of the baby. At that time, the mother did not have a positive gonorrhea culture.

(8) The requirement that a gonorrhea test be performed antepartum is an important requirement for the safety of the mother and the baby. A mother with gonorrhea cannot be safely delivered by a midwife at home. Potential complications include eye infections, pneumonia and meningitis in the baby, postpartum infection of the uterus in the mother, and the danger of contamination of the birth attendants.

(9) Respondent accepted D.A.S. as a patient. On July 19, 1984, respondent was at the home of D.A.S. when D.A.S. was experiencing some early signs of labor. Since D.A.S. had continued that pattern for some 24 hours, respondent took her to Tampa General Hospital to have a doctor verify what was happening. According to respondent, D.A.S. was given demerol at the hospital and was sent back home. Respondent drove her home. At some time in the evening of July 20, 1984, said time not established in the record, respondent returned to the home of D.A.S. as a result of a telephone call. She remained in the living room for approximately 20 minutes speaking with D.A.S.'s sister-in-law. She then heard sounds from D.A.S. in another room. When respondent went in to that room, D.A.S.'s baby's head was apparent and meconium was present. Respondent sent her assistant out to her car to retrieve her equipment. The infant was very limp, lethargic, raspy and bluish. Respondent suctioned the infant due to the presence of meconium and told her assistant to telephone the pediatrician and the neonatal unit at Tampa General Hospital. The baby's father and his male friend took the baby to the hospital in their automobile. The baby was admitted to the hospital at 23:22 on July 20, 1984, and was discharged on July 31, 1984, with a final primary diagnosis of pneumonia. Respondent could not remember the time of birth of this infant and did not keep any notes of the delivery. While she testified that she only "worked" on the infant for about 20 minutes after its birth, the birth certificate states that the infant was born at 9:10 p.m. on July 20, 1984. Respondent did not make or submit a completed birth certificate to the local registrar of vital statistics or to HRS.

(10) After the infant was taken to the hospital, respondent turned her attention to D.A.S. D.A.S. had hemorrhaged and had vaginal lacerations. Respondent estimated that D.A.S. had lost 500 ccs of blood. She had not stopped bleeding when she was taken to the hospital by her sister-in-law, though her pulse and blood pressure readings did not indicate a problem with shock. D.A.S. was admitted

232

to Tampa General Hospital sometime after 23:22 on July 20, 1984, but before 00:10 on July 21, 1984. At the hospital, she was given 2 units of red blood cells and was discharged on July 24, 1984.

(11) Tampa General Hospital is located approximately four miles away from the D.A.S. residence. Respondent did not accompany either the infant or D.A.S. to the hospital. There was no evidence that either the father, his male friend or the sister-in-law had any medical or nursing background or abilities.

(12) A newborn baby needs oxygen when it is limp, bluish in color and respiration is poor. Respondent did not administer oxygen to the D.A.S. newborn. Respiratory distress in a newborn is a complication urgent enough to require emergency medical care, and the most appropriate manner of transporting a newborn in need of oxygen to a hospital is by emergency medical service.

(13) Hemorrhage in mothers after delivery is one of the largest causes of death from childbirth. Other side effects of postpartum hemorrhage include several anemia and shock, which can lead to death in the absence of appropriate medical treatment and care. It was unsafe for the sister-in-law of D.A.S. to transport D.A.S. to the hospital by car. An emergency medical transport team should have been utilized in case D.A.S. had gone into shock or there was a need for intravenous infusion during transport to the hospital.

(14) If the time of birth of the D.A.S. infant was 9:10 p.m. as stated on the birth certificate, the expiration of time between D.A.S.'s delivery and admission to the hospital could have exacerbated the effects of the hemorrhage and lacerations by extending blood loss.

(15) Respondent's records for D.A.S. do not contain a written emergency plan.

(16) As a result of a prior Administrative Complaint filed on or about September 19, 1984, and a Stipulation and Agreement dated April 8, 1985, respondent paid an administrative fine, admitted violating certain rules, was placed on probation for one year and was required to take continuing education relevant to the practice of midwifery. The facts which for the basis of the instant Administrative Complaint either became known or were verified during the probationary period imposed as a result of the former Administrative Complaint.

## CONCLUSION OF LAW

The practice of midwifery is governed by Chapter 467, *Florida Statutes.* The Department of Health and Rehabilitative Services is empowered to take disciplinary action against licensees for violations of

that Chapter and/or the rules promulgated in Chapter 10D-36, *Florida Administrative Code.*

Here, respondent Skippy King is charged with violating Rules 10D-36.046(4) and (9) and Rule 10D-36.042, *Florida Administrative Code,* with regard to patient V.W. Rule 10D-36.046(4)(g) requires that a patient be referred for physician care when the "estimated featl weight [is] less than 2500 grams or greater than 4000 grams." Here, the evidence demonstrates that respondent did estimate, or at least should have estimated, the fetal weight of V.W.'s baby to be in excess of 4000 grams. Delivery of a large baby in a home situation can present grave risks to both the mother and the newborn baby. Rule 10D-36.042(4) requires an examination by a physician during the third trimester for risk assessment utilizing certain enumerated criteria. Even if it can be found that a third trimester examination of V.W. was performed by a physician, the record of that examination does not contain information sufficient to demonstrate that V.W. was a proper candidate for home delivery by a midwife. Rule 10D-36.045(9) requires a midwife to report to HRS when certain named emergency measures are utilized. The evidence presented by HRS was insufficient to demonstrate that the Woods Maneuver falls into the categories defined in that Rule.

The Respondent has admitted that she violated Rule 10D-36.045 with regard to patient C.S. by delivering her without a satisfactory laboratory test for gonorrhea. While no actual damage occurred, the home delivery of a child by a mother with gonorrhea could have been a potential risk to the baby, the mother and the birth attendants.

The Administrative Complaint does not cite a specific regulatory violation with regard to the D.A.S. delivery and subsequent transport to the hospital. It simply alleges that respondent exercised poor judgment and should have, at the very least, contacted an emergency medical transport team to deliver the infant and mother to the emergency room. The evidence presented does sustain a finding that respondent's conduct with regard to D.A.S. and the infant was unprofessional in that she allowed the two individuals, both of whom were experiencing serious complications, to leave her care without trained medical staff available to administer emergency medical treatment.

HRS has urged a finding of numerous other violations of its rules and statutes with regard to the patient D.A.S. and her baby. These include the failure to submit a completed birth certificate for the infant, failure to keep a record of the written emergency plan and failure to remain with the mother and child for a sufficient period of time. These violations are all the subject of rules and statutes not alleged or named

234

in the Administrative Complaint filed in this proceeding, nor are these factual allegations contained in the Complaint. Accordingly, respondent cannot be found guilty of violations not charged.

The evidence does demonstrate that respondent had been guilty of unprofessional conduct with respect to patients V.W., C.S. and D.A.S. Unprofessional conduct, as defined in Section 467.203(1)(f), *Florida Statutes,* includes any departure from the standards of practice of midwifery as established by HRS, "in which case actual injury need not be established." The respondent, having departed from the rules governing midwifery, as discussed above, is subject to the disciplinary action enumerated in Section 467.203(2), *Florida Statutes.*

As authorized by Section 467.203(4), *Florida Statutes,* HRS has established guidelines for the disposition of disciplinary cases. For violations related to standards of practice regarding the acceptance of patients at risk or without a medical risk assessment and departures of established standards, the Department has listed revocation as a potential penalty for a first offense, along with other forms of disciplinary action. In determining the appropriate penalty to be imposed, Rule 10D-36.055(1) provides that the following factors shall be considered:

"(a) the severity of the offense;

(b) the danger to the public;

(c) the number of repetitions of the offense;

(d) the length of time since the last violation;

(e) the number of disciplinary actions taken against the licensee;

(f) the length of time licensee has practiced;

(g) the actual damage, physical or otherwise, to the patient;

(h) the deterrent effect of the penalty imposed;

(i) any efforts for rehabilitation;

(j) any other mitigating or aggravating circumstances"

Here, respondent is guilty of unprofessional conduct with regard to patients V.W., C.S. and D.A.S. in that she departed from established standards of conduct set forth in the rules. The nature of the offenses are serious and could have resulted in serious harm or death of the infants, mothers and even the birth attendants. Respondent has previously been disciplined for other actions relating to the practice of midwifery. The offenses committed in this action indicate either an inability to recognize a risk situation, a failure to appreciate the

**235**

dangers involved should complications arise or an inability to react appropriate in an emergency situation. To allow respondent to continue to practice midwifery would be inconsistent with the legislative intent to regulate that practice "for the purpose of protecting the health and welfare of mothers and infants." Section 467.002, *Florida Statutes.*

## *RECOMMENDATION*

Based upon the findings of fact and conclusions of law recited herein, it is RECOMMENDED that respondent's license to practice midwifery in Florida be REVOKED.

Respectfully submitted and entered this 1st day of December, 1987, in Tallahassee, Florida.